UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

A<small>NNETTE</small> C<small>OFFMAN</small>,

   Plaintiff,

v.

U<small>NITED</small> S<small>TATES</small> S<small>TEEL</small> C<small>ORPORATION</small>,

   Defendant.
_____/

Case No. 14-12273

S<small>ENIOR</small> U.S. D<small>ISTRICT</small> J<small>UDGE</small>
A<small>RTHUR</small> J. T<small>ARNOW</small>

**O<small>RDER</small> D<small>ENYING</small> D<small>EFENDANT</small>'<small>S</small> M<small>OTION FOR</small> S<small>UMMARY</small> J<small>UDGMENT</small> [22]**

  Plaintiff sues her employer for allegedly discriminating against her as a white woman and retaliating against her for protesting the alleged discrimination. On September 30, 2015, Defendant filed the instant Motion for Summary Judgment [Dkt. #22]. On October 30, 2015, Plaintiff filed a Response [25], to which Defendant filed a Reply [28] on November 16, 2015. At the conclusion of a hearing held on April 13, 2016, the Court took the motion under advisement.

  For the reasons stated below, Defendant's Motion for Summary Judgment [22] is **DENIED**.

**F<small>ACTUAL</small> B<small>ACKGROUND</small>**

  Plaintiff is a white woman who began working for Defendant in April 2007. On June 25, 2012, Plaintiff transitioned into a new position as a Customer Service Representative (CSR) in Defendant's Business Planning Department, which

oversees the shipment of steel coils to Defendant's customers. Plaintiff was a bargaining unit employee. Her supervisor in this position was Sandra Orr, a black woman. Orr's supervisor was Thomas Clemens, a white man and Director of the Business Planning Department.

Plaintiff's troubles in the CSR position allegedly began with inadequate training. On January 2, 2013, Plaintiff completed the certification process for a CSR, representing that she was adequately trained. By the end of January, two of the department's six CSRs left the department. Orr redistributed their workload to the other CSRs. Plaintiff was assigned a higher workload than two CSRs with more experience.

Orr allegedly treated Plaintiff with hostility that she did not direct at employees who were not white women. Plaintiff's testimony on this point is supported by Stephanie Parker, who is also a white woman. Parker and Latasha Walker, a black woman, served as Orr's management associates. Parker testified that Orr talked down to her and Plaintiff (the only white women in the department for the majority of the relevant timeframe). Parker further testified that Orr was friendly and sociable with the two other black women in the department and had no problems interacting with the department's white men. She testified that she believed Orr discriminated against her and Plaintiff as white women. Indeed, around the time that Plaintiff was certified as a CSR, Parker complained of Orr's

alleged discrimination against her to a mentor.  Her complaints resulted in two meetings with Clemens (the department director), including one meeting in which Clemens explained Parker's complaints to Orr directly.  Parker felt that Orr continued mistreating her after the meeting.  Parker was transferred to another position by Clemens in June 2013.

Defendant's discipline policy is not in writing.  Testimony from Orr, Clemens, and Kenneth Bauer (a Labor Relations Department representative) indicates that Defendant employs a "progressive discipline" system.  Pursuant to that system, a verbal warning may be followed by a written warning and, if the employee continues to makes similar mistakes, a suspension (no longer than five days if imposed without a prior hearing).  A suspension for five days or longer may be converted into discharge.  An employee can appeal a suspension, which may be set aside or reduced by an arbitrator.

Plaintiff received nine written disciplinary notices for performance errors in the time (roughly four months) between her certification and her termination.  In each case, Orr initiated the disciplinary process by writing an incident report and sending it to her supervisor, Clemens, who in turn sent it to Labor Relations Department representative Bauer (a white man).  Bauer had the final say over whether and how to discipline Plaintiff in response to one of Orr's incident reports.  In addition to these nine written notices, Plaintiff allegedly received two verbal

warnings from Orr in January 2013. Plaintiff, however, denies that she ever received verbal warnings.

Plaintiff complained of Orr's treatment of her to her union representative, Bonnie Burke. On February 20, 2013, Burke told Labor Relations representative Bauer that the problems between Plaintiff and Orr might be a "black white thing." On March 4, 2013, Burke and Plaintiff met with Bauer in his office, telling him that Orr was "harassing" Plaintiff and that it needed to stop. Bauer reminded Plaintiff and Orr of Defendant's internal grievance process. On March 14, 2013, an internal committee met to discuss Plaintiff's allegations (though she had not yet filed a formal complaint). Bauer subsequently interviewed three other CSRs in Plaintiff's department about her allegations. Two indicated that they had little knowledge of Orr's interactions with Plaintiff; the third said Orr treated Plaintiff fairly and indicated that Orr might reasonably get frustrated with Plaintiff because Plaintiff frequently interrupted her and asked basic questions. Bauer reported the results of his interviews to the internal committee.

On March 27, 2013, Burke sent an e-mail on Plaintiff's behalf to Orr, Bauer, Clemens, and several others. The e-mail described an alleged incident in which Orr asked Plaintiff to prove, in order to avoid written discipline, that she had started some particular work. Plaintiff allegedly produced some documentation, but protested Orr's treatment of her and told her that she had to speak to the union.

Orr allegedly said that "the opportunity to not be written up had passed since [Plaintiff] said she was calling her Union." In addition to describing this alleged incident, Burke's e-mail demanded that Orr's harassment of Plaintiff stop. Clemens subsequently told a colleague that he did not appreciate Burke's wide distribution of her e-mail.

On April 17, 2013, the Equal Employment Opportunity Commission (EEOC) sent Defendant notice that Plaintiff had filed a Title VII complaint with the EEOC. On April 18, 2013, Bauer had eight written communications with in-house counsel; though the content of the communications is privileged, Defendant's privilege log states that they concerned "plaintiff's administrative complaint." Bauer claims that he did not see the EEOC notice until after Plaintiff was fired. On April 23, 2013, Plaintiff filed a complaint with her union.

On April 26, 2013, Bauer issued Plaintiff's final two disciplinary notices, imposing a five-day suspension for each (Bauer had also imposed a five-day suspension on an earlier disciplinary notice, issued March 1, 2013). The same day, Bauer made the decision to terminate Plaintiff by converting her five-day suspensions into discharge. Plaintiff's last day of work was May 10, 2013. On May 15, 2013, Plaintiff filed a second internal complaint.

A "mini-arbitration" on Plaintiff's first six disciplinary actions was held in April 2014. The arbitrator set aside two disciplinary actions and reduced the

length of two suspensions. A separate arbitration on Plaintiff's final three disciplinary actions (the basis for her termination) was held in October 2014. The arbitrator overturned one of the actions, reduced the other two, and ordered Plaintiff reinstated. Due to Plaintiff's reports of anxiety concerning working with Orr, she was not medically cleared to return to her CSR position in the Business Planning Department. Plaintiff accepted a different, lower-paying position with Defendant.

## ANALYSIS

Plaintiff brings claims for discrimination and retaliation under Title VII and Michigan's Elliott–Larsen Civil Rights Act (ELCRA). "The legal standards governing [a plaintiff's] Title VII claims and her corresponding state-law claims under [ELCRA] are nearly identical." *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 825 (6th Cir. 2013) (citing *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 468, 472 (6th Cir. 2012); *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 652–53 (6th Cir. 2012)). The Court therefore analyzes the claims together, except where the parties have raised alleged distinctions in the governing law.

## I. Discrimination

Plaintiff brings discrimination claims under Title VII and ELCRA, alleging that Defendant discriminated against her as a white woman (not solely as a white person and/or solely as a woman). Plaintiff's discrimination claim is

"intersectional" because it is based on the combination of her race and gender, rather than on her race and/or gender separately. The Sixth Circuit has recognized the viability of an intersectional race-and-sex discrimination claim under Title VII. *Shazor v. Prof'l Transit Mgmt., Ltd.*, 744 F.3d 948, 957–58 (6th Cir. 2014).

Defendant argues that Plaintiff's intersectional theory is not properly before the Court because Plaintiff did not specify her claims' intersectional nature in her complaint or in her EEOC complaint. Plaintiff's complaint alleges discrimination against her as a white person and discrimination against her as a woman. Discrimination against her as a white woman is both of these things. Thus, Plaintiff's allegations in her complaint provided sufficient notice of her intersectional claim.

### A.    Cat's paw analysis

Plaintiff must satisfy the elements of the "cat's paw" theory of liability because Orr, the intermediate supervisor accused of acting on discriminatory animus, was not the decisionmaker formally responsible for her discipline and termination. *See DeNoma v. Hamilton County Court of Common Pleas*, 626 F. App'x 101, 105 (6th Cir. 2015) (citing *Thrash v. Miami Univ.*, 549 F. App'x 511, 522 (6th Cir. 2014)). Under the cat's paw theory, "if a supervisor performs an act motivated by [prohibited] animus that is *intended* by the supervisor to cause [the formal decisionmaker to take] an adverse employment action, and if that act is a

proximate cause of the ultimate employment action, then the employer is liable." *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011) (footnote omitted); *see also Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 351 n.10 (6th Cir. 2012) (extending *Staub*'s framing of the cat's paw analysis to Title VII claims). The intent element is satisfied if the supervisor wants to cause the adverse action or believes the adverse action substantially certain to result from her actions. *See Staub*, 562 U.S. at 422 & n.3. The proximate cause requirement "excludes only those links that are too remote, purely contingent, or indirect." *Id.* at 419 (quoting *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010)) (internal quotation marks and brackets omitted). Because it is common for an adverse action to have multiple proximate causes, "[n]either independent investigation nor independent judgment on the part of the [formal decisionmaker] provides a *per se* defense." *Chattman*, 686 F.3d at 352.

Plaintiff has raised a genuine issue of material fact concerning whether Orr acted with intent to cause adverse employment actions and thereby proximately caused such actions. Orr chose to write the incident reports underlying all of Plaintiff's discipline. The only purpose of such reports is to recommend disciplinary action. There is little evidence that Clemens exercised independent judgment in deciding whether to forward the reports to Bauer, or that Bauer

exercised independent judgment in deciding whether to impose discipline. In any case, such evidence does not provide a *per se* defense. *Chattman*, 686 F.3d at 352.

Plaintiff has also raised a genuine issue of material fact concerning whether Orr's acts were motivated by prohibited animus. Both Plaintiff and Parker, the white woman who worked as one of Orr's management associates, testified that they believed Orr treated them worse than the other CSRs because they were white women. When combined with Plaintiff's evidence of disparate treatment, discussed below, this is sufficient to raise a genuine issue of material fact.

   **B.   Prima facie case**

Because Plaintiff only offers circumstantial evidence, she must "make out a prima facie case of discrimination by showing 1) that she was a member of a protected class; 2) that she was discharged; 3) that she was qualified for the position held; and 4) that she was replaced by someone outside of the protected class." *Shazor*, 744 F.3d at 957 (quoting *Griffin v. Finkbeiner*, 689 F.3d 584, 592 (6th Cir. 2012)) (internal brackets omitted). The final element may alternatively be established by showing that "similarly situated, non-protected individuals were treated better." *Id.* at 958 (citing *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995)). This alternative way of establishing the final element is "especially useful" where the plaintiff, as here, "is not replaced, or is not replaced with a single person." *Id.* at 958–59 (citing *Clayton v. Meijer, Inc.,* 281 F.3d 605,

608–10 (6th Cir. 2002); *Clay v. United Parcel Serv., Inc.,* 501 F.3d 695, 704–05 (6th Cir. 2007)). Here, only the first and final elements are disputed.

The first element of the prima facie case (membership in a protected class) may be modified with respect to Plaintiff's Title VII claim because Plaintiff claims she was discriminated against in part for being white. Where a Title VII plaintiff alleges discrimination on account of a "majority" or dominant-group identity, the first element typically requires a showing of "background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 915 (6th Cir. 2013) (quoting *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 255 (6th Cir. 2002)). The prima facie case for ELCRA claims, in contrast, is not modified for "majority" plaintiffs. *Id.* (citing *Lind v. City of Battle Creek*, 681 N.W.2d 334, 335 (Mich. 2004)).

It is undisputed that Plaintiff claims discrimination on account of a protected identity, satisfying the first prong of the prima facie case for her ELCRA claim. Whether this suffices to satisfy the first prong with respect to her Title VII claim, as well, depends on whether Plaintiff is required to show background circumstances supporting the suspicion that Defendant is "that unusual employer" who discriminates against the "majority" to which Plaintiff belongs. The Court is unaware of any authority applying the background circumstances requirement to

an intersectional claim like Plaintiff's, which is based on the combination of a "majority" identity (white person) and an oppressed identity (woman). The Court need not, however, decide whether the requirement applies. A plaintiff claiming discrimination on the basis of whiteness may raise a genuine issue of material fact concerning "background circumstances" with evidence of "the mere fact that an adverse employment decision was made by a member of a racial minority." *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008) (citing *Zambetti*, 314 F.3d at 257 (6th Cir. 2002)). Here, Plaintiff has raised a genuine issue of material fact concerning whether the adverse employment actions taken against her are attributable to Orr, a black woman, thus raising a genuine issue of material fact on the background circumstances requirement even if it applies.

With respect to the fourth and final prong, the parties agree that Defendant did not hire someone to fill Plaintiff's position. Since Plaintiff was not replaced, it is especially useful to consider whether the final prong is satisfied by evidence that Defendant gave better treatment to similarly situated individuals not belonging to the relevant protected class. *Shazor*, 744 F.3d at 958–59. Defendant argues that because Plaintiff was allegedly disciplined only when she made the same mistake multiple times, she cannot show that other individuals were "similarly situated" unless she shows that they also made the same mistake multiple times. Even accepting this proposition, however, Plaintiff has raised a genuine issue of material

11 of 18

fact. Plaintiff has offered evidence that while she was disciplined for submitting "hold lists" late on two occasions, another CSR (a white man) also submitted hold lists late on two occasions and was not disciplined. Plaintiff has also offered evidence that she was disciplined for failing to put a date on shipping instructions; that this was a common mistake among the CSRs, raising the inference that at least one CSR had made the mistake multiple times; and that no other CSR was disciplined for the same mistake. This evidence of disparate treatment suffices to raise a genuine issue of material fact on the fourth and final prong.

In sum, Plaintiff has raised genuine issues of material fact on all elements of the prima facie case.

### C. Legitimate explanation; pretext

Once the plaintiff makes out a prima facie case, the burden "shifts to the employer to offer a legitimate, non-discriminatory explanation for its actions; finally, the burden shifts back to the plaintiff to show pretext." *Id.* at 957 (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). To survive summary judgment, Plaintiff "need only produce enough evidence to support a prima facie case and to rebut, but not to disprove, the defendant's proffered rationale." *Id.* (quoting *Griffin*, 689 F.3d at 593). "If the employer had an honest belief in the proffered basis for the adverse employment action, and that belief arose from reasonable reliance on the particularized facts before the employer when it made

the decision, the asserted reason will not be deemed pretextual even if it was erroneous." *Id.* at 960 (quoting *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 586 (6th Cir. 2009)).

Defendant points to the disciplinary actions against Plaintiff as a legitimate, non-discriminatory reason for her termination. Plaintiff argues that this explanation is pretextual, offering two lines of argument. First, she disputes the factual basis for most of the disciplinary actions, arguing that she did not commit the alleged errors at all or that they should not be considered errors in context. Second, she provides evidence that CSRs who were not white women committed some of the same errors she allegedly committed, but were not disciplined for them.

Determining the precise events underlying Plaintiff's disciplinary actions is a task for the jury. The parties dispute many details of the underlying events (e.g., whether Plaintiff gave Orr advance notice of certain shipping problems; whether Orr instructed Plaintiff to make a certain shipment by truck instead of by rail). Defendant has not produced evidence sufficient to compel a reasonable jury to accept Defendant's account of what happened.

Though Plaintiff admits to making certain errors, these concessions do not entitle Defendant to summary judgment, given Plaintiff's evidence that other CSRs were not disciplined in similar situations. For instance, the arbitrator's first ruling

overturned two disciplinary actions for Plaintiff's late submission of "hold lists," noting that two other CSRs had submitted hold lists late in the same period without facing discipline.  Plaintiff has also produced an e-mail from Orr to Clemens, noting that a white male CSR had "no legitimate reason" for failing to release "move holds" on a certain day—an error for which he was not disciplined.  The same CSR testified that he was not disciplined for missing a delivery deadline.  Finally, Plaintiff has offered evidence that while she was reprimanded for failing to put a delivery date on shipping instructions, at least four other CSRs made the same mistake at least once each, without being reprimanded.

      Defendant is not entitled to summary judgment under the "honest belief" defense.  The evidence shows that Bauer—Defendant's formal decisionmaker with respect to Plaintiff's discipline—accepted the facts as reported by Orr, rather than investigating them.  Bauer never spoke to Plaintiff about the disciplinary charges.  It is true that he interviewed three CSRs in Plaintiff's department; however, the purpose of those interviews was to investigate Plaintiff's allegations about Orr's hostility towards her, rather than Orr's allegations about Plaintiff's performance.  Thus, there is a genuine issue of material fact concerning whether Defendant, through Bauer, reasonably relied on the particularized facts before it when it determined that Plaintiff's performance warranted the discipline imposed, including her termination.

### D.     Conclusion on Plaintiff's discrimination claims

Plaintiff has raised genuine issues of material fact concerning whether Orr, motivated by animus against Plaintiff as a white woman, performed acts intended to cause her discipline and thereby proximately caused her discipline. She has also raised genuine issues of material fact on all elements of her prima facie case and on the pretextual nature of Defendant's legitimate explanation for her discipline. Accordingly, Defendant is not entitled to summary judgment on Plaintiff's Title VII and ELCRA discrimination claims.

## II.    Retaliation

Plaintiff brings retaliation claims under Title VII and ELCRA. To establish a Title VII retaliation claim, a plaintiff must show that she engaged in protected conduct and that her protected conduct was a but-for cause of an adverse employment action. *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 504 (6th Cir. 2014) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013)). Protected conduct includes "complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices." *EEOC v. New Breed Logistics*, 783 F.3d 1057, 1067 (6th Cir. 2015) (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579, 580 n.8 (6th Cir. 2000)). A plaintiff can meet her burden on the causation element by showing very close temporal proximity between an employer's first knowledge of protected activity

and the adverse employment action. *Id.* at 505 (citing *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). However, temporal proximity is only evidence of causation "if the adverse employment action is unlike the action previously contemplated or does not occur on the schedule previously laid out." *Id.* at 507.

Plaintiff engaged in protected conduct at least as early as February 20, 2013, when her union representative, Burke, spoke to Bauer about Plaintiff's allegations that Orr was harassing her. Plaintiff's first three disciplinary actions were issued more than a week prior to that date. There is no evidence that those first three actions were caused by Plaintiff's protected conduct.

Plaintiff relies on temporal proximity between her protected conduct and the remaining disciplinary actions to prove causation. Plaintiff's next four disciplinary actions were issued on March 1—nine days after Burke spoke to Bauer. The discipline imposed in this second round was more severe. As soon as Plaintiff received these disciplinary notices, she engaged in more protected conduct: she and Burke met with Bauer and demanded an end to Orr's alleged harassment. Defendant conducted a brief internal investigation after this meeting. On March 27, Burke sent an e-mail to a number of Defendants employees, relaying another of Plaintiff's harassment allegations and demanding that the harassment stop. Clemens (the director of Plaintiff's department) said that he did not appreciate

Burke distributing the e-mail so widely.  On April 17, Defendant received notice that Plaintiff had filed an EEOC complaint.  Bauer exchanged eight written communications with in-house counsel about Plaintiff's "administrative complaint" the next day, which suggests he knew of the EEOC complaint.  Plaintiff filed an internal grievance on April 23.  Three days later, Bauer issued Plaintiff's final two disciplinary actions and made the decision to terminate Plaintiff.

　　Defendant argues that Plaintiff's termination was not "unlike the action previously contemplated" because it represented the culmination of the series of disciplinary actions against her.  Indeed, that series of disciplinary actions began before Plaintiff's earliest protected activity.  It is possible that Plaintiff continued to be disciplined after her protected activity not *because* she engaged in protected activity, but because she continued to perform poorly.  It is also possible that Defendant increased the severity of Plaintiff's discipline for successive incidents of poor performance, culminating in her termination, not because she engaged in protected activity but because she made more egregious errors or persisted in making the same errors.

　　Nevertheless, Plaintiff has raised a genuine issue of material fact concerning whether her termination was retaliatory.  As explained in more detail above, a reasonable jury could conclude that Bauer did not perform an investigation

sufficient to sustain an honest belief that Plaintiff's alleged performance errors warranted her termination. Indeed, the arbitrator's second ruling found that Plaintiff's performance did not warrant her termination. Nevertheless, Bauer made the decision to terminate her—just three days after she filed an internal grievance, and roughly a week after Defendant received notice that she had filed an EEOC complaint. Accordingly, a reasonable jury could conclude that Plaintiff would not have been terminated (even if she might have been disciplined less severely) if she had not formally challenged the alleged discrimination via her EEOC complaint and internal grievance. Defendant is not entitled to summary judgment on Plaintiff's claim that her termination was retaliatory.

## CONCLUSION

For the reasons stated above,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment [22] is **DENIED**.

**SO ORDERED**.

Dated: May 5, 2016

s/Arthur J. Tarnow
Arthur J. Tarnow
Senior United States District Judge